THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT CASTILLO, a/k/a John Mercado, Defendant-Appellant.

First District (5th Division)   Nos. 61184, 62309 cons.

Opinion filed July 9, 1976.

414

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BARRETT delivered the opinion of the court:

Defendant Robert Castillo, a/k/a John Mercado, was indicted for the rape and armed robbery of Sheila Hindsley and the armed robbery of Leo Hindsley and Mary Hindsley. Following a jury trial, defendant was found guilty on all counts and was sentenced by the trial court to 15 to 25 years imprisonment for rape and 5 to 10 years for each count of armed robbery, all sentences to run concurrently. Thereafter, defendant brought this appeal and contends: (1) that the prosecutor's cross-examination of defendant was prejudicial, (2) that the prosecutor's final argument was prejudicial, (3) that the admission of the composite drawing was prejudicial error, (4) that defendant was denied his constitutional right to present evidence, (5) that the microanalyst's report was erroneously admitted, and (6) that the evidence was not so overwhelming as to prevent the conviction from being the result of the above-mentioned errors. The facts pertinent to this appeal are as follows:

On August 22, 1972, Leo and Mary Hindsley and their 17-year-old daughter were staying in Room 1155 at the Palmer House Hotel in downtown Chicago while vacationing in Chicago. At approximately 11 p.m. Sheila, who was alone in the room writing postcards, heard a knock at the door. Sheila went to the door and asked who was there. She was told that it was the hotel security guard and that he wished to be admitted. She took the chain off the door and opened it and was confronted by defendant who held a gun which he pointed at her. He entered, shut the door, and replaced the night chain.

Defendant tried to open a locked cosmetic case and when he failed he demanded money from Sheila. She gave him $5 from her wallet. He then made her take off her clothes and raped her. At this point Mrs. Hindsley arrived at Room 1155, used her key to unlock the door, but was unable to enter the room because of the night chain which was in the locked

position. Sheila screamed to her mother to hurry and knocked the chain loose. Mrs. Hindsley then entered the room, and defendant took her wallet at gunpoint. Mr. Hindsley arrived moments later and his wallet was taken. Defendant ripped the phone from the wall and left, warning the Hindsleys not to leave the room for five minutes or be killed.

A few minutes later Mr. Hindsley called hotel security from another room on the 11th floor and Chicago police officers arrived shortly thereafter. Sheila described defendant as a male, Puerto Rican, 5'7" or 5'8", weighing 130 pounds, wearing gold wire-rimmed glasses with a rose tint, and having long sideburns. Each of the Hindsleys included facial blemishes such as pock marks or large pores under the eyes as part of their description.

Sheila was taken to Henrotin Hospital where tests were taken which resulted in a smear specimen being transported to the Crime Lab. A blanket from Room 1155 was also transported to the Crime Lab in the early morning hours of August 23. A department microanalyst testified that the slide and blanket possessed human spermatozoa of recent origin but the samples were too minute for further testing. One month prior to trial defendant submitted to biological testing but no positive identification could be made by comparing his body fluids with the traces in the slide and blanket.

At 12:50 a.m. on August 23, Room 1115 was processed for latent fingerprints. However, no prints were found which failed to match the fingerprints of the Hindsley family. Later that day the Hindsleys were unable to identify any mug shots from the albums which they viewed. During a 1- to 2-hour session the Hindsleys separately described defendant to a police artist until a final sketch was made.

During the last week of August, 1972, a Chicago police investigator showed a copy of the artist's sketch to Jack Moran. He operates the Moran Detective Agency which provides security to industrial and commercial property. Moran gave the investigator a photo of defendant which was affixed to an employment record. Defendant had been employed as a security guard for the Moran Agency in 1971. Moran testified that defendant had worked at the Sherman House Hotel in Chicago. Defendant denied that he ever worked at that hotel.

Detective Edward Pickett of the Criminal Justice Division, State of Connecticut, received six photographs from the Chicago Police Department in the mail on September 21, 1972. This group included a blow-up of the photo of defendant obtained from Moran. On that date, Detective Pickett went to the Hindsley home in Baltic, Connecticut. He showed the photographs to Mrs. Hindsley who selected defendant's photograph and signed the back as instructed. Shortly thereafter Mr. Hindsley arrived home, later followed by Sheila. Each was shown the

group of six pictures and each independently of the others selected defendant's photograph and signed the reverse side of the photograph.

On November 17, 1972, Detective Pickett returned to the Hindsley residence, this time with a group of 19 photographs which had been sent to him by the Chicago Police Department. In defendant's employment photo he had been dressed in a suit and had been wearing glasses but in this set of 19 photos defendant was dressed casually and was not wearing glasses. Again each of the Hindsleys independently of each other selected defendant's photograph.

On February 23, 1973, the Hindsleys returned to Chicago. They went to the courtroom for Branch 44 of the Circuit Court of Cook County and were placed in rooms just off of the courtroom by Assistant State's Attorney Charles Leary. At that time, defendant was seated in the courtroom with his attorney, Mr. Kadish.

There were well over 100 people in the courtroom at the time and Mr. Leary and Mr. Kadish escorted each of the Hindsleys, one at a time, into the courtroom. There, each of the Hindsleys, independently of each other and with no influence from the attorneys, selected defendant as the assailant of August 22.

For the defense Clarence Monroe, an optician, testified that he fits eyeglasses, grinding the glass according to the optomologist's prescription. He had made several pairs of glasses for defendant, the last of which being made in April, 1972. The glasses according to prescription were described as "myopic" indicating the condition of nearsightedness. He demonstrated that a lens as thick as defendant's would protrude noticeably from wire-rimmed frames. He stated that defendant always purchased plastic frames similar to those which he wore in court and that he had never made a pair of rose tinted glasses for defendant.

During the defense case, defendant requested permission to amend his list of witnesses to include his mother who would testify concerning defendant's name, the glasses he wore, and his national origin. This motion was denied.

Three witnesses testified that defendant always wore thick glasses with plastic frames rather than wire-rimmed frames, and that defendant never had pock marks under his eyes. In addition, Michael Kennedy, a long-time friend of defendant, and Nancy Healy, in whose home defendant resided during August of 1972, testified that defendant did not have a maroon jacket. All Hindsleys had testified that defendant wore such a jacket. Kennedy also testified that defendant was right-handed. Sheila had testified that he held the gun in his left hand.

Defendant testified that he was in the Healy home continuously from 5:30 p.m. on August 22 until 7:30 a.m. on August 23. He went to bed at

approximately 10:30 p.m. and the entire Healy family was present at that time.

Defendant testified that his given name at birth was John Mercado and that he began to use the name of Robert Castillo at age 10 in honor of his stepfather whose name was Castillo. He possessed a social security card in each name and gave both names at the time of his arrest. He stated that he used the name of John Mercado while working for Moran. Defendant denied ever working with Moran personally and that he had ever worked at the Sherman House. He stated that when employed by the Moran Agency he signed cards when requested to do so but at no time did he fill out the forms or know of their contents.

Defendant denied committing the offenses against the Hindsleys and stated that he had never been at the Palmer House Hotel. He stated that he is right-handed and has worn glasses since age 10, being unable to see without them. He never had pock marks under his eyes; never wore tinted glasses; never wore wire frames; and never owned a maroon jacket.

He stated that he was with Nancy Healy until 10:30 p.m. on August 22 and that at one time they had intended to marry. Nancy testified that she met defendant in October, 1971 and became his girlfriend. On August 22 he was living in the attic of her family home but after dinnertime she had no recollection of defendant's whereabouts on that particular evening.

OPINION

■■ The only issue contested by defendant at trial was the identification issue. In Illinois the testimony of even one witness is sufficient to convict, provided that the witness is credible and that he viewed the accused under such circumstances as would permit a positive identification. *(People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) The strength of an identification is determined by considering whether the witness was close enough to the accused for a sufficient length of time under conditions adequate for observation. *(People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.) Precise accuracy in describing facial characteristics is unnecessary where an identification is positive. *(People v. Chambers* (1969), 112 Ill. App. 2d 347, 251 N.E.2d 362.) At trial, through cross-examination, the testimony of witnesses who knew defendant and vigorous argument, the defense attempted to rebut the Hindsleys' testimony by pointing out that defendant was right-handed, did not have pock marks, wore a style of eyeglasses other than that described, and did not own a maroon jacket. However, the record reveals that the identification of the Hindsleys remained clear, convincing, and positive. There was no hint of impropriety in the identification procedure employed by the law enforcement officers. The room in which the

offenses occurred was well illuminated and the Hindsleys, particularly Sheila, observed defendant in close proximity for an extended period of time. We find that the identification of defendant amply supports his conviction.

Defendant, however, contends that errors which occurred at trial require the reversal of his conviction. Specifically, he contends that the identification evidence was not strong enough to preclude the possibility that the errors (to be set out later) contributed to his conviction. The State maintains that the errors which did exist were harmless considering the overwhelming evidence of guilt.

■■ The purpose in reviewing a criminal case is to determine whether a just verdict has been rendered, upon sufficient competent evidence, after a trial in which no error prejudicial to defendant's rights has occurred rather than a determination of whether the record is error free. (*People v. Hawes* (1956), 8 Ill. 2d 501, 134 N.E.2d 781.) Where it appears that the errors in the record could not have reasonably affected the result, the errors are harmless and the judgment of conviction should be affirmed. *People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766.

● 3 The following review of defendant's contentions reveals that the record is not error free. However, we cannot agree with defendant that the errors committed in this case require reversal. Initially, defendant complains of the erroneous admission of evidence during the State's case. Specifically, defendant contends that the admission of the composite drawing and permitting it to be taken into the jury room during deliberations constituted prejudicial error. Defendant cites *People v. Turner* (1968), 91 Ill. App. 2d 436, 235 N.E.2d 317 for the proposition that the admission of a composite drawing is reversible error. *Turner* held that composite drawings are inadmissible as hearsay and rejected the State's contention that the error was harmless on the following grounds: (1) defendant was identified by only one witness and (2) in cases comprised of conflicting evidence it cannot be presumed that the jury acted only upon competent evidence. However, in *People v. Jones* (1975), 34 Ill. App. 3d 103, 339 N.E.2d 485, the admission of a composite drawing was held to be harmless error where the sketch was only one of several methods of identification utilized and thus did not improperly influence the jury. We hold that any error involved in the admission of the sketch was harmless because of the clear and convincing identification by three occurrence witnesses.

It is well settled that the matter of whether exhibits should be taken to the jury room is within the sound discretion of the trial judge and his ruling will not be disturbed unless there was an abuse of such discretion to the prejudice of defendant. (*People v. Allen* (1959), 17 Ill. 2d 55, 160 N.E.2d 818; *People v. Ciucci* (1956), 8 Ill. 2d 619, 137 N.E.2d 40, *aff'd*, 356

U.S. 571, 2 L. Ed. 2d 983, 78 S. Ct. 839.) The testimony of the police artist provided a necessary safeguard to the admission and use by the jury of the sketch. Thus, in the context of this case it cannot be said that there was an abuse of discretion.

■■ Defendant contends that allowing Jack Moran, a nonoccurrence witness, to testify to supplying a picture of defendant to police after viewing the composite sketch resulted in an accusation by Moran that defendant was the assailant. Mr. Moran's testimony was very limited. He testified that a conversation took place, that he was shown a sketch, and that he gave defendant's photo-identification employment card to the police. While we cannot see the purpose in calling Mr. Moran to give this testimony, there is no suggestion in his testimony that he knew why the police were inquiring about the man portrayed by the sketch. Thus, defendant's argument that Moran's conduct accused defendant of being the assailant of August 22 is too attenuated to be prejudicial.

■■ Defendant next contends that it was error to admit the report of the microanalyst, Maryanne Mohan, into evidence and to allow it into the jury room. While the report tended to corroborate Sheila's testimony that penetration had occurred, it could not have prejudiced defendant regarding the contested issue of identification. On its face the report stated that the traces were too small for further testing, *i.e.*, for use as a comparison with defendant's body fluids for the purpose of identification. Thus, even if the report were to be construed as Maryanne Mohan's deposition, we cannot say that allowing it into the jury room amounted to reversible error.

The bulk of alleged error occurred during the presentation of the defense's case. Defendant contends that the prosecutor's questions during his cross-examination of Nancy Healy and defendant were prejudicial and implied that defendant had been involved in prior criminal activity. He asserts that these questions implied that defendant had a prior criminal record and had committed the crimes of indecent liberties with a child, impersonation of a police officer, and battery. The latitude to be allowed in the cross-examination of witnesses is within the sound discretion of the trial court and only in a case of clear abuse of discretion which manifestly prejudices defendant will a court of review interfere. (*People v. Jones* (1975), 34 Ill. App. 3d 103, 339 N.E.2d 485.) Defendant cites several cases as authority for the proposition that no question is more damaging to a defendant than one which suggests he has engaged in prior criminal activity. (*People v. Brown* (1972), 3 Ill. App. 3d 1022, 279 N.E.2d 765; *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450; *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650.) In addition, he points to the following language used in *People v. Deal* (1934), 357 Ill. 634, 192 N.E. 649:

"The sustaining of objections to improper, prejudicial, and inflammatory remarks, and instructing the jury to disregard such statements, do not, nor does the withdrawal or retraction by the speaker of such statements, always cure the error. 192 N.E. at 652."

While we do not disagree with these general principles, we find that they do not require reversal in this case.

■■ Generally, evidence of prior criminality is admissible if it establishes identity, shows presence at the scene where an alibi is claimed, or to prove design, motive or knowledge if at issue. *(People v. Davis* (1958), 14 Ill. 2d 196, 151 N.E.2d 308.) It may also be used to challenge the witness' credibility. *(People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E. 2d 450.) Where the witness can be effectively impeached without revealing unnecessary and prejudicial detail, this must be done. *(People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35; *People v. Brown* (1972), 3 Ill. App. 3d 1022, 279 N.E.2d 765; *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) While apprising the jury of prior criminality in violation of these rules can constitute reversible error even where the jury is instructed to disregard the answer or remark *(People v. Deal* (1934), 357 Ill. 634, 192 N.E. 649), the conviction will not be reversed where the evidence of guilt is so overwhelming that the error is harmless beyond a reasonable doubt *(People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35), or where the probative value of the evidence outweighs the tenuous inference that prior criminality may have occurred. *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

■■ Nancy Healy testified that she had met defendant in October 1971 and became his girlfriend. She further stated that he was living in her family's home on August 22, 1972, and that she had been in his company at dinnertime on that date but her memory of the remainder of the evening was unclear. Defendant testified that he spent the evening of August 22 with Nancy; that he retired at 10:30 p.m. He further testified that he had planned on marrying Nancy at one time. The prosecutor asked Nancy if she had been 15 years old in August 1972 and whether she had become pregnant by defendant. The court sustained defense objections to these questions and the witness did not answer. During his cross-examination of defendant, the prosecutor asked him whether Nancy slept with him on the night of August 22 and whether Nancy had his baby. The court sustained defense objections to these questions, defendant did not answer, and the jury was instructed to disregard them. The State maintains that no error occurred as the prosecutor was properly exploring his alibi by posing these questions. We cannot agree. The prosecutor may have accomplished his purpose by asking more circumspect questions. However because of the overwhelming evidence

of guilt in this case, the State has established that posing these unanswered questions was harmless beyond a reasonable doubt. *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35.

■■ On direct examination defense counsel asked defendant how many times he had been arrested between August 22, 1972 and December 1972. In response defendant failed to mention his arrest for battery in Crestwood, Illinois which occurred within that period of time. This was the context in which the prosecutor asked defendant about being charged with battery. Defense counsel opened the door to this question, failed to object to it and so defendant cannot now complain that it constitutes reversible error.

■■ Defendant also complains of the prosecutor asking defendant whether he ever told Nancy that he was a policeman. Defendant answered over objection that he had not. The question was probative of the identity issue as this was the method used to enter Sheila Hindsley's hotel room. Even if defendant had told his girlfriend that he was a policeman, posing the question was at most a tenuous inference that a crime had actually been committed. We find that the probative value of the inquiry outweighed whatever prejudice may have resulted from this tenuous inference of possible criminal activity. *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

This principle is equally applicable to the prosecutor's question as to whether he had answered an employment questionnaire concerning a previous arrest record, if any. Additionally, there was no objection made to this question so it cannot serve as a ground for reversal. *(People v. Nichols* (1974), 21 Ill. App. 3d 432, 315 N.E.2d 663.) The defense counsel did not object until the prosecutor made an unnecessary comment in attempting to refresh defendant's recollection. The jury was told to disregard the comment and in any event the comment did not affect the propriety of posing the question.

■■ Defendant next contends that it was error to allow the prosecution to call Nancy Healy in rebuttal to impeach defendant upon collateral matters. A hearing was held out of the presence of the jury to determine what questions, if any, Nancy could be called to answer. The court determined that she could be called and asked if she knew about defendant's possession of a gun. This could hardly be deemed a collateral matter and the defense had previously called Nancy to state that she had knowledge of defendant's possessions. The prosecutor proceeded further to ask her whether defendant had told her that he was a police officer. Even if this would be classified as collateral matter, impeachment on a collateral matter is harmless where there is overwhelming evidence of guilt as in the instant case. *People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385.

■■ Defendant contends that the prosecutor's reference during cross-examination to employment questionnaires which were marked but never introduced for admission into evidence denied defendant his constitutional right to confront witnesses because no foundation for the questionnaires had been laid. It is difficult to imagine how something used only to refresh the recollection of a witness, the contents of which were never revealed, could be used to prove the truth of matter asserted therein. Even if this remark could be considered to raise the unrevealed contents of the questionnaires to the level of admitted hearsay, erroneously admitted hearsay is harmless error where the evidence of guilt is overwhelming. *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564; *People v. Eastin* (1972), 8 Ill. App. 3d 512, 289 N.E.2d 673.

The State confesses error in three instances of cross-examination of defendant: (1) asking him whether by contradicting one of his witnesses he implied that she was lying, (2) making an argumentative comment about defendant's failure to remember in detail the events of a day 2½ years past, and (3) inferring that defendant was fired because of misconduct. We agree with the State, however, that under the facts of this case the errors were harmless beyond a reasonable doubt. *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35; *People v. Gill* (1973), 54 Ill. 2d 357, 297 N.E.2d 135.

■■ Defendant next contends that he was denied his constitutional right to present evidence. In the middle of the defense case, defendant moved to amend his list of witnesses to include his mother who would have testified as to defendant's name, national origin, and glasses. The motion was denied. As her testimony would have been merely cumulative and defendant failed to comply with discovery, the exclusion of her testimony does not require reversal. (*People v. Montgomery* (1973), 16 Ill. App. 3d 127, 305 N.E.3d 627.) *People v. Cline* (1975), 60 Ill. 2d 561, 328 N.E.2d 534, which is cited by defendant, is distinguishable from the instant case. While the witness who was precluded from testifying in *Cline* had only cumulative testimony to offer, she also had strong reasons to avoid testifying which may have caused a jury to view her testimony as highly credible.

■ Next defendant contends that the prosecutor's argument was improper and prejudicial in several aspects. *People v. Williams* (1968), 40 Ill. 2d 522, 529-30, 240 N.E.2d 645, stated the parameters of proper argument:

" * * * the rule may be stated that, in the absence of express prohibition, every fact which, in no illegal manner, comes to the knowledge of the jury during the progress of a trial, and which may reasonably influence their judgment is a proper subject of comment in argument."

Defendant contends that the prosecutor's comment upon his failure to call

the parents of Nancy Healy amounts to reversible error. Defendant testified that he was at the Healy home continuously from 5:30 p.m. on August 22, 1972, until he left for work between 7-7:30 a.m. the next morning. He further stated that he went to bed at 10:30 p.m. at which time the entire Healy family was present. As a general rule, it is improper for the prosecution to comment on defendant's failure to present witnesses which were equally accessible to both the prosecution and defense. *(People v. Rubin* (1937), 366 Ill. 195, 7 N.E.2d 890; *People v. Munday* (1917), 280 Ill. 32, 117 N.E. 286.) However, where defendant introduces evidence of his activities with potential witnesses ostensibly for the purpose of establishing an alibi, his failure to produce such witnesses is a proper subject of comment by the prosecutor. *(People v. Swift* (1925), 319 Ill. 359, 150 N.E. 263; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) The prosecutor's remarks regarding defendant's failure to call such witnesses must not be misleading, unfair, or unduly prejudicial. *(People v. McShan* (1975), 32 Ill. App. 3d 1068, 337 N.E.2d 263; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) Under the above authority, we find that the prosecutor's reference to the Healys' absence was a proper subject for comment and was neither misleading nor unfair.

■■ Defendant contends that the prosecutor's comments during final argument implied that the conduct of defense counsel was improper and thus denied him a fair trial. The prosecutor stated that he expected to be interrupted many times by defense objections and then pointed out to the jury that he had indeed been interrupted several times. These statements, while unfortunate, were uttered during rebuttal in response to defense counsel's assertions that the State had thrown up smoke screens composed of incidental issues designed to draw the jury's attention away from the main issue. In this context, we cannot say that such remarks approach the prejudicial content and effect of those uttered in the cases cited by defendant. Those cases revealed that convictions were reversed because prosecutorial argument, in close cases, cautioned the jury that the defense counsel was attempting to free a guilty person by trickery and suborning perjury. *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19; *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317; *People v. Savage* (1934), 358 Ill. 518, 193 N.E. 470.

■■ Defendant further contends that the portions of the prosecutor's argument which dealt with the evils of rape and defendant's modus operandi were prejudicial and require reversal. It has been noted by the Illinois Supreme Court in *People v. Burnett* (1963), 27 Ill. 2d 510, 517, 190 N.E.2d 338, that:

> "Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be

discountenanced by the courts. [Citation.] It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.] Similarly, the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law."

The prosecutor's remarks concerning the evils of rape in no way approached the comments condemned in *People v. Garreau* (1963), 27 Ill. 2d 388, 189 N.E.2d 287 and were entirely proper under *Burnett*. There was competent evidence of defendant's service as a hotel security guard. It was a legitimate inference that this experience taught him that hotel guests open their doors to security personnel. The prosecutor spoke of defendant's modus operandi in this sense. We find that this comment was also proper under *Burnett*.

■■ Lastly, defendant cites *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297, for the general rule that the court of review must consider the cumulative effect of errors upon the fairness of defendant's trial. However, a perusal of *Hudson* reveals that it does not require the conviction to be reversed in this case. In *Hudson* the identification procedures employed were suspect but not sufficiently suggestive to warrant reversal were it not for other errors which cumulatively culminated in a reversal. Faced with a weak identification of defendant, the *Hudson* court could not say that the State had established that the errors were harmless beyond a reasonable doubt. But even in cases involving serious constitutional questions, the reviewing courts of Illinois have never hesitated to invoke the doctrine of harmless error in an appropriate situation. *(People v. Montgomery* (1973), 16 Ill. App. 3d 127, 305 N.E.2d 627.) This is such a situation for while defense counsel has pointed out multiple instances of error, these errors considered either in their individual or cumulative effect neither strengthened the State's case nor weakened the defense's case. The clear and convincing testimony of the three occurrence witnesses stands unscathed by error. Thus, we find that if all error were expunged from the record a fair-minded jury could not return a verdict of acquittal. The State has met its burden of establishing that the errors, even in their cumulative effect, were harmless beyond a reasonable doubt.

For these reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ, P. J., and DRUCKER, J., concur.